IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LOUIS MESSINA, | ) |
| | ) |
| ANGELIQUE MESSINA, | ) |
| | ) |
| and | ) |
| | ) |
| V.M., a minor, by and through her parent | ) Case No. 1:20cv1237 |
| and natural guardian, LOUIS MESSINA, | ) |
| | ) |
| Plaintiffs, | ) JURY TRIAL DEMANDED |
| | ) |
| v. | ) |
| | ) |
| SYRIAN ARAB REPUBLIC | ) |
| Serve:      Minister of Foreign Affairs | ) |
|     Syrian Foreign Affairs | ) |
|     Damascus, Syria | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

NOW COME the Plaintiffs, LOUIS MESSINA, individually and as the parent of V.M.,

and ANGELIQUE MESSINA (collectively referred to herein as "Plaintiffs"), by counsel, and for

their Complaint against Defendant, the SYRIAN ARAB REPUBLIC ("Syria" or "Defendant"),

arising out of a terrorist attack in Baghdad, Iraq on March 9, 2005, state as follows:

## I.  THE PARTIES

1.  Plaintiff Louis Messina is a victim of the March 9, 2005 bombing of the Al

Sadeer Hotel in Baghdad, Iraq.

2.  Plaintiff Angelique Messina is the wife of Louis Messina.

3.  Plaintiff V.M. is the daughter of Louis Messina.

4.  Defendant Syria is a foreign state. Since December 29, 1979, Syria has been

designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export

Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.    JURISDICTION AND VENUE

5.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

6.    Despite its status as a foreign state, Defendant is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to its longstanding designation as a "State Sponsor of Terrorism."

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

8.    At the time of the March 9, 2005 attack, Louis Messina, a dual citizen of South Africa and Italy, was performing a contract awarded by the government of the United States of America and acting within the scope of that employment.

## III.    NATURE OF THE ACTION

9.    On March 5, 2009, at 6:20am local time, a garbage truck containing over three thousand pounds of explosives was detonated outside of the Al Sadeer Hotel, a property located near the Agriculture Ministry in Baghdad, Iraq and used to house United States government contractors (the "Al Sadeer Attack"). The explosion wounded more than forty people, including Louis Messina.

10.    Al-Qaeda in Iraq, also known as Al-Qaeda in Mesopotamia, ("AQI") immediately claimed responsibility for the attack.

11.    The Al Sadeer Attack was the product of a broader conspiracy between AQI and Syria to attack American interests in Iraq with violent acts of terrorism.

12.     Syria conspired with AQI to advance its goal of expanding its influence in Iraq, fostering political instability, and pressuring American leaders to withdraw military forces.

13.     To carry out the Al Sadeer Attack, AQI needed financial support, training in the use of explosives and tactics, freedom to travel across the border with Syria, and access to explosive materials. Syria provided AQI with each of these types of support.

14.     By knowingly and intentionally providing material support and resources to enable and assist AQI in carrying out acts of terrorism, Syria is liable for the damages suffered by Plaintiffs as a direct and proximate result of the Al Sadeer Attack.

## IV.     FACTUAL ALLEGATIONS

### A.     Syria's History of Support for International Terrorism

15.     In 1966, Syrian Ba'athists implemented a successful coup d'etat, seizing control of the Syrian government and consolidating power. A party member named Hafez al-Assad was subsequently appointed as the Minister of Defense.

16.     From this role, Hafez al-Assad led a second coup in 1970, this time aiming to purge the Ba'athist party of internal opposition to his aims at ruling authority. By 1971, Hafez al-Assad had risen to be the unopposed President of Syria. His family has held power ever since.

17.     Hafez al-Assad was succeeded as President by his son, Bashar al-Assad in 2000.

18.     The Assad regime operates Syria as a police state, with heavy influence and importance placed upon military goals, with nearly all military leadership positions controlled by members of the Assad-affiliated minority sect through a series of overlapping security services that all answer directly to President Assad.

19.     Because of this leadership and command structure, large scale sponsorship of terrorist organizations and funding of international military activities cannot occur without

approval from the highest levels of government. Syria's Foreign Minister admitted as much in

1986 when commenting on the actions of another terror group: "Whoever knows my government

must realize that such attacks could not be carried out without its awareness."

20.      A 1987 United States Department of State bulletin described that:

> Available evidence indicates that Syria prefers to support groups whose
> activities are generally in line with Syrian objectives rather than to select
> targets or control operations itself. Damascus utilizes these groups to attack
> or intimidate enemies and opponents and to exert its influence in the region.
> Yet at the same time, it can disavow knowledge of their operations.

21.      In line with these policies and goals, Syria has routinely provided material support

to groups such as Hamas, Hezbollah, Palestinian Islamic Jihad, and AQI throughout the Assad

regime.

**B.      The Birth of AQI**

22.      Bayat al Imam, the predecessor of AQI, was founded in Jordan in the early 1990s.

That group associated with al-Qaeda in 1999 and joined the fight against the invasion of

Afghanistan in 2001 and the invasion of Iraq in 2003.

23.      AQI first appeared in Iraq in 2004 when the Jordanian militant Abu Musab al-

Zarqawi ("Zarqawi"), the then leader of Bayat al Imam, formed an alliance with Osama bin

Laden and al-Qaeda. In exchange for Zarqawi's allegiance, bin Laden agreed to recognize

Zarqawi as the leader of al-Qaeda's official affiliate in Iraq.

24.      Upon receiving this endorsement, Zarqawi quickly grew AQI and shaped it into

one of the most violent terrorist organization in the world. AQI routinely used suicide bombings

as a means of attacking Western interests in Iraq and to stoke sectarian tensions through assaults

against Shiite holy sites. AQI became widely known for its brutal tactics and willingness to

attempt large scal.

25.     The destruction of the Golden Mosque in Samarra, Iraq by AQI in February 2006 is widely viewed as the tipping point for sectarian violence that claimed tens of thousands of lives in Iraq.

### C.     The Development of the Syria-AQI Relationship

26.     In 2002, Zarqawi was arrested and imprisoned by the Islamic Republic of Iran. He was quickly released, however, because he possessed a valid Syrian passport indicating that we worked for Syria.

27.     Zarqawi then lived in Syria for much of 2002, using it as a base of operations for planning his next move into Iraq. From Syria, he recruited fighters, trained them in Syrian military facilities, and arranged for financing from the Syrian government.

28.     After Zarqawi and his organization moved to Iraq in 2003, Syria remained a critical transit point for AQI. Fighters and weapons would originate in Syria and were smuggled into Iraq, with the full knowledge and assistance of Syrian security forces. Training of those forces continued on Syrian military bases. Funds raised throughout the region were funneled through Syria to Zarqawi in Iraq.

29.     Enabling all of these activities, the Syrian government allowed AQI personnel to freely move across the Iraq-Syria border. Volunteers to fight in Iraq were allowed passage by stamping their passports with phrases such as "volunteer for jihad" and with entry visas identified for the purpose of joining "the Arab volunteers."

30.     The United States identified this type of support as early as 2003, when Congress issued the Syria Accountability and Lebanese Sovereignty Restoration Act, urging Syria to "immediately and unconditionally stop facilitating transit from Syria to Iraq of individuals,

military equipment, and all lethal items," and to "cease its support for 'volunteers' and terrorists

who are traveling from and through Syria into Iraq to launch attacks."

31.     Syria supported AQI because, among other reasons, it considered the installation

of a successful American-backed democracy in Iraq a threat to its own totalitarian regime.

Violent attacks against American interests in Iraq helped to prevent the expansion of America's

efforts to bring political freedom to people oppressed by tyrannical regimes that routinely

supported international terrorists. In 2003, the Foreign Minister of Syria publicly stated that

"Syria's interest is to see the invaders defeated in Iraq."

32.     The 2005 Patterns of Global Terrorism document published by the US State

Department described Syria as a "facilitation hub for terrorists operating in Iraq."

33.     In addition to Syria's general willingness to support terrorist groups, it also

maintained specific and close ties to Zarqawi and his organization. Abu Qaqa, a cleric who

helped found AQI, was on the Syrian government payroll. Fawzi Mutlaq Al Rawi, the head of

the Syrian wing of the Iraqi Ba'th party, directly appointed by President Assad, was personally

involved in delivering funding and weapons to AQI. Abu Moaz, a Syrian intelligence officer,

personally transported AQI leaders across the Iraqi border to training camps.

34.     On February 28, 2008, the United States Department of the Treasury designated

Badran Turki Hishan Al Mazidih ("Badran") pursuant to Executive Order 13224. When

announcing this designation, the Under Secretary for Terrorism and Financial Intelligence stated

that "Syria has become a transit station for al Qaida foreign terrorists on their way to Iraq" and

that Badran went "to great lengths to facilitate the flow through Syria of money, weapons, and

terrorists intent on killing U.S. and Coalition forces and innocent Iraqis." He "obtained false

passports for foreign terrorists, provided passports, weapons, guides, safe houses, and allowances

to foreign terrorists in Syria and those preparing to cross the border into Iraq."

35.     Despite this evidence, Syria refused to kill or capture Badran. When American

forces eventually attacked Badran's base, Syria condemned the action as "serious aggression."

36.     In the 2008 Country Reports on Terrorism, the State Department concluded that

"nearly 90% of all foreign fighters entering Iraq are transiting from Syria."

37.     This Court has found, on multiple occasions, that Syria provided material support

to Zarqawi and AQI starting at least in 2002 and continuing throughout the time relevant time

period to this case. *See, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 192 (D.D.C.

2017); *see also Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68 (D.D.C. 2008) ("Syria

served as Zarqawi's organizational and logistical hub from 2002 to 2005").

### C.     The Al Sadeer Attack

38.     The Al Sadeer Hotel is located in Baghdad, Iraq, adjacent to the Iraqi Agriculture

Ministry. Due to its size and location, it was used heavily as a place to house private contractors

and foreign security personnel. Although guarded, the Al Sadeer Hotel was well outside of the

heavily fortified area of Baghdad known as the Green Zone.

39.     As of March 9, 2005, Louis Messina was employed as a Security Supervisor for

DynCorp International on a contract for the United States Department of Defense in Iraq and

residing at the Al Sadeer Hotel. This choice of residence was dictated by his employer as a

requirement of his job.

40.     At approximately 6:20am on the morning of March 9, 2005, AQI fighters drove a

garbage truck filled with three-thousand pounds of explosives into the parking lot next to the Al

Sadeer Hotel. Insurgents exchanged small arms fire with security guards for a short time and

then the truck exploded. At the time of the explosion, the truck was approximately forty yards from the Al Sadeer Hotel.

41.      The blast left a large crater in the parking lot, ten-feet deep and dozens of feet wide, knocked out all of then street facing windows of the Al Sadeer Hotel, and collapsed many of the ceilings within the rooms. Several people were killed in the assault and more than forty were wounded.

42.      Louis Messina was asleep in his room at the Al Sadeer Hotel when the gunfire started. He awoke quickly and went to the window to see what was transpiring. He immediately began getting dressed and assembling his gear so that he could join the defense of the compound, but the explosion occurred soon thereafter and glass from the shattered windows filled the room.

43.      Louis Messina sustained severe injuries in the blast, including permanent visual impairment in his right eye, among other physical, psychological, and emotional injuries.

44.      Within hours of the Al Sadeer Attack, AQI disseminated public statements on the internet taking credit for the incident. AQI claimed to have chosen Al Sadeer as a target because of its "Jewish staff" and the presence of foreign security personnel.

45.      AQI subsequently posted a video online of the attack.

## V.      CAUSES OF ACTION

### COUNT I – PROVISION OF MATERIAL SUPPORT FOR THE ATTEMPTED EXTRAJUDICIAL KILLING OF LOUIS MESSINA (28 U.S.C. § 1605A(c))

46.      Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

47.      At the time of the events at issue, Syria was designated as a state sponsor of terrorism and remains so designated today.

48.     Syria provided material support and resources to AQI for the purpose of supporting, enabling, advancing, and benefitting from AQI's terrorist activities, including the commission of attacks against United States personnel and interests in Iraq.

49.     As such, Syria's provision of material support and resources to AQI was and is intentional, wanton, and willful, with the explicit understanding that violence against American contractors, such as Louis Messina, was an expected and welcomed result of those actions.

50.     Such conduct violates 28 U.S.C. § 1605A.

51.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

52.     The Al Sadeer Attack was an unauthorized, illegal, and deliberate use of physical force resulting in substantial human casualties, executed with the attempt to bring about injuries and/or death to United States personnel.

53.      As a direct and proximate result of Syria's willful, wrongful, and intentional acts, Louis Messina was injured in the Al Sadeer Attack.

54.     As a direct and proximate result of Syria's actions, Angelique Messina and V.M. have experienced significant solatium damages including, but not limited to, severe mental anguish and harm caused by the loss of Louis Messina's society and comfort.

55.     Syria's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as AQI, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

56.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

57.     AQI's act of terrorism against Louis Messina was intentional and reckless, extreme and outrageous, and caused Angelique Messina and V.M. to experience severe emotional distress.

58.     The detonation of an explosive device by AQI violated acceptable norms of humane treatment under the laws of the United States and the acceptable norms of international law by which all civilized nations transact their affairs.

59.     This act of terrorism was extreme and outrageous, perpetrated with the intent to intimidate and coerce.

60.     Syria, through its influence with AQI, knowingly and willfully provided material support, training, and direction to this act of terrorism, with the express purpose of causing severe injury or death to the victims and intimidating others.

61.     Syria knew, or reasonably should have known, that this terrorist act and others like it would cause severe emotional distress to the family members of those who were attacked.

62.     Therefore, Syria is responsible for the damages suffered by Angelique Messina and V.M. as a direct and proximate result of the Al Sadeer Attack.

63.     Because Syria acted in a willful and wanton manner, showing a conscious disregard for the rights of others, Plaintiffs request an additional award of punitive damages.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant liability against Syria

on all Counts and award damages as to Louis Messina on Count I and as to Angelique Messina

and V.M. on Count II, granting Plaintiffs:

a. Compensatory damages for personal injuries to Louis Messina, including pain and suffering and economic damages in the amount of $20,000,000, or a sum certain to be determined at trial;

b. Solatium and Intentional Infliction of Emotional Distress damages in a total amount of $13,000,000, comprised of the following sums:

   - $8,000,000 on behalf of Angelique Messina, wife of Louis Messina;
   - $5,000,000 on behalf of V.M., daughter of Louis Messina;

c. Punitive damages in the amount of $150,000,000, allocated proportionately with the compensatory judgments awarded to the Messina Family;

d. Interest, from March 9, 2005 until the date of judgment; and

e. Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: May 12, 2020                           Respectfully submitted,

                                 /s/ Kevin A. Hoffman_____
                          Randy D. Singer (DCD Bar No. VA057)
                          Kevin A. Hoffman (DC Bar No. 1044559)
                          SINGER DAVIS, LLC
                          1209A Laskin Road
                          Virginia Beach, VA 23451
                          Phone: (757) 301-9995
                          Fax: (757) 233-1084
                          Email: randy.singer@singerdavis.law
                          Email: kevin.hoffman@singerdavis.law
                          *Counsel for Plaintiffs*