## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LOUIS MESSINA et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:20cv1237** |
| | ) | |
| **SYRIAN ARAB REPUBLIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

Plaintiffs, Louis Messina et al. (collectively referred to herein as "Plaintiffs"), come now before this Court seeking the entry of default judgment against the Syrian Arab Republic ("Syria"), and in support thereof state as follows:

## I.        INTRODUCTION

This action arises out of a hotel bombing in Baghdad, Iraq on March 9, 2005. That morning, a garbage truck packed with explosives rolled into the parking lot of the Al Sadeer Hotel following a barrage of gunfire directed at the hotel guards. Located outside the Green Zone, the Al Sadeer was the largest hotel in the area outfitted to house Coalition contractors. When the garbage truck detonated about forty yards from the hotel, it burst every window in the building and left a large crater. Shrapnel and debris flew for over 300 yards. In all, four people died during the assault and over thirty were wounded. Among them were Louis Messina, Tamara Hassler, Russell Curry, and Steven Thomas (collectively, "the Victim Plaintiffs").

With the explicit support of Syria, the Zarqawi organization, also known as al Qaeda in Iraq ("AQI"), executed the March 9, 2005 bombing of the Al Sadeer Hotel ("the Attack"). Because of its longstanding support for terrorists, and its material support of AQI in particular,

Syria has forfeited its immunity under the Foreign Sovereign Immunities Act ("FSIA"). *See* 28 U.S.C. § 1605A. As the state sponsor, supplier, recruiter, and trainer for AQI, Syria is liable to Plaintiffs for the provision of material support towards this act of extrajudicial killing that resulted in injuries to the Victim Plaintiffs and the damages to their family members.

Accordingly, Plaintiffs respectfully move this Court to enter the following findings and conclusions: (1) that AQI is responsible for the Attack, injuring Plaintiffs and their immediate family members; (2) that Syria provided material support and sponsorship to AQI during the relevant time period, enabling the Attack; (3) to enter default judgment against Syria as to liability on behalf of all Plaintiffs pursuant to the private cause of action found in 28 U.S.C. § 1605A(c) and applicable state law claims; and (4) to grant compensatory and punitive damages awards commensurate with the damages evidence presented by Plaintiffs.

## II.     PROCEDURAL HISTORY

This matter is comprised of two separately filed complaints, served on Syria independently, and then later consolidated by leave of Court.

The Complaint for the initial *Messina* Plaintiffs was filed on May 12, 2020. ECF No. 1. The same day, a summons to the Syrian Arab Republic was issued electronically. ECF No. 3. Syria was formally served with the *Messina* Complaint on November 23, 2020. ECF No. 12. Plaintiffs then entered an affidavit for entry of default on April 7, 2021, ECF No. 14, and the Clerk entered default on April 8, 2021, ECF No. 15.

The *Hassler* Complaint was filed January 26, 2021 and assigned case number 1:21cv237. *Hassler*, ECF No. 1. The summons to the Syrian Arab Republic was issued electronically on January 29, 2021. *Hassler*, ECF No. 4. Syria was formally served on August 9, 2021. *Hassler*,

ECF No. 13. Plaintiffs then entered an affidavit for entry of default on December 3, 2021,

*Hassler*, ECF No. 14, and the Clerk entered default the same day. ECF No. 15.

On December 6, 2021, Plaintiffs filed a motion to consolidate *Hassler* with the present

matter. *Hassler,* ECF No. 16. On December 22, 2021, the Court granted Plaintiffs' Motion to

Consolidate and *Hassler* was subsequently consolidated with the present action. ECF No. 16.

## III.    LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT

"Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for

the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim

or right to relief by evidence that is satisfactory to the court." *Estate of Botvin v. Islamic*

*Republic of Iran*, 873 F. Supp. 2d 232, 236 (D.D.C. 2012) (citing 28 U.S.C. 1608(e)). This is the

same as the standard for entry of default judgment against the United States under Rule 55(d);

*see Hill v. Republic of Iraq*, 328 F. 3d 680, 683–84 (D.C. Cir. 2003) ("a FSIA default winner

must prove damages "in the same manner and to the same extent" as any other default winner").

The law does not require additional evidence or a higher standard of evidence than what

the Court would ordinarily receive to render a judgment. *See* 28 U.S.C. § 1608(e). Rather,

"[w]hen the Defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA

leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff

must provide." *Han Kim v. Democratic People's Republic of Korea*, 774 F. 3d 1044, 1047 (D.C.

Cir. 2014); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012)

(evidence received via sworn affidavits); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d

105, 109 n.6 (D.D.C. 2005) (by taking "judicial notice of related proceedings and records"). In

sum, evidence "satisfactory to the Court," 28 U.S.C. 1608(e), may be provided at an evidentiary

hearing, but can also consist of "sworn affidavits or declarations, prior judicial fact-findings, and

other documents submitted in accordance with the Federal Rules of Evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 242 (D.D.C. 2020).

In weighing the evidence, the trial court must consider Congress' stated purpose in enacting § 1605A—to "compensate the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *Kim*, 774 F.3d at 1408 (citation omitted), while simultaneously recognizing the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens v. Republic of Sudan*, 864 F. 3d 751, 785 (D.C. Cir. 2017). Although "[t]he Court must scrutinize the plaintiff's allegations," *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), it should also "accept as true the plaintiffs' uncontroverted evidence," *see Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); *see also Bennett v. Islamic Republic of Iran*, 507 F. Supp. 2d 117, 125 (D.D.C. 2007). The Court may utilize broad discretion in assessing whether to grant a default judgment.

## IV.  STATEMENT OF FACTS

### A.  <u>Syria's Longstanding Support for International Terrorism</u>

First designated in 1979, U.S. Dep't of State, *State Sponsors of Terrorism*, https://bit.ly/3LGVGBZ, Syria has continuously provided political and military support to terror groups as a means of reaching its policy goals for over forty years, *see* U.S. Dep't of State, *Country Reports on Terrorism 2020: Syria*, at 201, https://bit.ly/3ygE3mp. It has historically backed a vast range of militant groups, including Hezbollah, Hamas, the Iranian Islamic Revolutionary Guard Corps, the Palestinian Islamic Jihad, AQI, and the Islamic State of Iraq and Syria ("ISIS"). *Id.*; Expert Witness Report of Dr. Daveed Gartenstein-Ross attached as "Exhibit 1" at 32. CIA documents from as early as 1985 confirmed this, stating that Syria "sees [the] use

of terror as a tool of statecraft—a way to extend its foreign policy reach." *Id*. at 32–33. In 1987, a U.S. State Department bulletin cited evidence that "Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself," and that it utilizes these groups to "exert its influence in the region," while still retaining the ability to "disavow knowledge of their operations." *Id*. at 33.

Syria has adopted a more conciliatory position when suitable to its interests, a habit described as "a double game of provoking and assuaging Washington, offering covert support for groups like Hezbollah, and more recently the Iraqi insurgents, then making timely concessions to the United States to ward off serious trouble." *Id*. Or, in the words of a scholar of Near Eastern Studies at Princeton, "ever since the 1980s, Syria has played this game of being both the arsonist and the fire department." *Id*. Despite occasionally adopting a superficial stance of cooperation, Syria has consistently utilized violent proxy groups to achieve its foreign policy goals.

### B.     Evolution of AQI and the Zarqawi Organization

Abu Musab al-Zarqawi ("Zarqawi") was born in 1966 in Zarqa, Jordan to a poor, conservative family. *Id*. at 13. After a tumultuous crime-laden youth, Zarqawi experienced a religious awakening, prompting his voyage to Afghanistan in 1989. *Id*. Arriving too late to fight the Soviets, Zarqawi instead joined the jihadist movement under the tutelage of leaders like Osama bin Laden. *Id*. at 14. Soon, Zarqawi developed enough relationships in Afghanistan to form the "Zarqawi organization" in 1993. *Id*. First known as "Bayat al Imam" ("Allegiance to the Imam"), it aspired to overthrow the Jordanian monarchy with an Islamist government. *Id*.

After returning to Jordan and attempting various "ill-fated attacks," Zarqawi was arrested and sentenced to fifteen years in prison, but was released in 1999 when King Abdullah II declared general amnesty for Jordanian prisoners. *Id*. at 14–15. Zarqawi would go on to execute

the infamous assassination of Laurence Foley in 2002. *See Foley v. Syrian Arab Republic*. 249 F.

Supp. 3d 186 (D.D.C., 2017); Ex. 1 at 47–48. The Zarqawi Organization would then join the

fight against the invasion of Iraq in 2003. *See* Ex. 1 at 48–49.

Zarqawi's operational goals during this time were succinctly articulated in a 2004 letter

intercepted by U.S. forces identifying four groups as targets: (1) Americans, (2) Kurds, (3)

soldiers, police, and agents, and (4) Shia Muslims. *Id*. at 17. The Zarqawi organization was

"notorious for its brutality, particularly its practice of kidnapping, torturing, and beheading its

victims, which included foreign contractors" and frequently utilized suicide bombings,

particularly vehicle-borne improvised explosive devices ("VBIEDs"). *Id*. at 17–18.

The Zarqawi organization was "highly active in Iraq from 2003 through the time of the

Al Sadeer attack." *Id*. at 41. In August 2003, the Zarqawi organization bombed the Jordanian

embassy in Baghdad. *Id*. at 17. Less than two weeks later, it claimed responsibility for a VBIED

attack on U.N. headquarters in Baghdad, killing twenty-two. *Id*. That month, the organization

killed eighty-five in a vehicle bombing outside the Imam Ali Mosque in Al Najaf, Iraq. *Id*.

In October 2004, the Zarqawi organization became the first official affiliate group of al

Qaeda. *Id*. After pledging an oath of allegiance, Zarqawi's group not only adopted the new name

of AQI, but also gained access to an "international fundraising, facilitation, and recruitment

network, while retaining much of [its] autonomy." *Id*. Although the Zarqawi organization would

change its name twice by 2006, it "remain[ed] the dominant jihadist force in Iraq, with the same

goals, strategies, tactics, and key personnel as when it self-identified as AQI." *Id*. at 19.[1]

---

[1] The organization is today known as the Islamic State, or ISIS. Despite a large number of name changes over the years, *see* Exhibit 1 at 1 n.1, 14, no fundamental change in mission, organizational structure, or personnel occurred before the end of 2005, the period relevant to the Al Sadeer Hotel Attack. Ex. 1 at 14. Accordingly, "al-Qaeda in Iraq (AQI)" or "Zarqawi Organization" is used interchangeably to refer to the group; for consistency, not all name changes will be referenced. *See* Ex. 1 at 16.

As AQI's attacks increased from 2004 to 2005, a declassified Defense Intelligence briefing confirmed AQI's "continued high operational/propaganda tempo." *Id*. at 18. In April 2005, one month after the Attack, the Zarqawi organization claimed it was responsible for two VBIEDs that killed over 160 Iraqis. *Id*. at 17. In line with the *modus operandi* of the Attack, AQI also "continued to target hotels in Iraq and beyond both before and after the Al Sadeer attack." *Id*. at 49. One such attack occurred about six months after the Attack, when AQI bombed three hotels in Amman, Jordan, killing at least fifty-seven people and wounding over 100. *Id*. at 49–50.

In sum, Zarqawi and his network executed some of the worst atrocities seen in Iraq from 2003–2007. *Id*. at 13. Zarqawi and AQI were directly responsible for a surge of assassinations, hostage takings, bombings, and beheadings that lasted until a U.S. airstrike killed him on June 7, 2006. *Id*. Achieving feats of terror of this magnitude was only possible with the resources of an informed and willing state sponsor. *See id*. at 42.

### C.    Syria's History of Support for AQI

Syria's support to AQI has been longstanding, well-established, and deliberate. *See id.* at 21–22. Events of the past two decades demonstrate Syria's "permissive attitude toward [al Qaeda] and other terrorist groups' foreign terrorist fighter (FTF) facilitation efforts during the Iraq conflict." U.S. Department of State, *Country Reports on Terrorism 2020: Syria*, https://bit.ly/3ygE3mp. Fueled by the desire to undermine Coalition efforts in Iraq, Syria provided support to the Zarqawi organization between 2002 and 2008, with Syrian officials publicly articulating their rationale. Ex. 1 at 21–22 ("Syria has a national interest in the expulsion of the invaders from Iraq"). By the time of the Attack, Syria "had supported several attacks in Iraq, including some of the most substantial attacks on Iraqi and Coalition forces." *Id*. at 42.

Syria provided, *inter alia*, financial support, a transit point for weapons and fighters, logistical resources, facilitation of transferring funds, "strategic assistance," and "safe passage and sanctuary" to Zarqawi's operatives. *Id*. at 21–32; 18 U.S.C. § 2339A(b)(1). Syrian support for AQI at the time of the Attack "was not anomalous." *Id*. at 22. The complexity of the Attack showcases "a causal connection to AQI's ability to carry out an attack like the Al Sadeer Hotel attack." *See id*. at 43.

### D.  The Al Sadeer Hotel Bombing

At approximately 6:30 am on March 9, 2005, gunfire erupted outside the Al Sadeer Hotel. *Id*. at 33. As the guards returned fire, two militants disguised in police uniforms drove a garbage truck packed with explosives towards the Hotel. *Id*. at 33–34. The truck exploded, blasting open every door and window of the Al Sadeer. *Id*. at 34. Pressure from the explosion funneled furniture out onto the parking lot and destroyed the cars parked below. *Id*. Four people were killed in the Attack and forty were wounded – four of whom were the Victim Plaintiffs. *Id*.

Within twenty-four hours, AQI took public responsibility for the Attack in three separate ways: (1) through a communiqué distributed on jihadist web forums; (2) later that day, when the emir of AQI's military wing released a congratulatory statement to leader and founder al-Zarqawi for the successful operation; and (3) the next day, when AQI released a video of the Attack and a lengthier audio recording explaining its role in the Attack. *Id*. at 35–36.

## V.  JURISDICTION

### A.  This Court has Subject Matter Jurisdiction over the Asserted Claims

A federal district court has subject matter jurisdiction over "any nonjury civil action against a foreign state," so long as one of the FSIA's enumerated exceptions to sovereign immunity apply. *See* 28 U.S.C. § 1330(a). In this case, Syria is subject to the FSIA's terrorism

exception, *see* 28 U.S.C. § 1605A, which confers jurisdiction against a foreign government if: (1) the claim is against a foreign state designated as a "State Sponsor of Terrorism" at the time of the act; (2) the victims are either nationals or employees of the United States; and (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of such acts. 28 U.S.C. § 1605A(a)(1)–(2).[2]

Regarding the first element, the Court may take judicial notice of Syria's status as a designated State Sponsor of Terrorism, both at the present time, and when the cause of action arose. *See, e.g.*, *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 34 (D.D.C. 2016) (finding that "Syria has been continuously designated a state sponsor of terrorism since 1979"); *see also* U.S. Dep't of State, State Sponsors of Terrorism, https://bit.ly/3QiH6Cn.

Plaintiffs also clearly meet the second element. Each of the Victim Plaintiffs were working on contracts on behalf of the United States Government at the time of the Attack, and all four were required to reside at the Al Sadeer Hotel to fulfill their job duties. Ex. 4 ¶ 4; Ex. 5 ¶ 4; Ex. 6 ¶ 3; Ex. 7 ¶ 3.[3] Accordingly, Plaintiffs satisfy the second jurisdictional element.

To establish the third element, Plaintiffs will present evidence of: (a) an act of extrajudicial killing; (b) committed with the aid of material support from Syria; (c) that resulted in personal injuries to the Victim Plaintiffs. Here, all three parts are met, as follows:

### i.     The Attack was an act of extrajudicial killing.

The FSIA's terrorism exception defines an extrajudicial killing by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extra-judicial killing" is "a deliberated killing not authorized by a previous

---

[2] Section 1605A(a)(2) also requires offering the foreign state an opportunity to arbitrate if the act occurred within the borders of that state. That is not applicable here since the Attack occurred outside of Syria.

[3] Plaintiff Louis Messina is a dual citizen of South Africa and Italy, but the Court has subject matter jurisdiction over claims related to his injuries because he was employed on a contract for the United States Department of Defense. Ex. 4 ¶ 4; *see Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 327 (D.D.C. 2014).

judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73. Historically, this definition was interpreted to "allow[] plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt." *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017). Any "deliberated" attempts to kill, regardless of whether they actually result in deaths, typically "fall within the scope of Section 1605A(a)(1)." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019). Some recent decisions have openly questioned this reasoning, *see, e.g.*, *Borochov v. Islamic Republic of Iran*, Case No. 1:19cv2855, 2022 WL 656168 at *8 (D.D.C. Mar. 4, 2022), but that issue is not relevant here because at least four individuals died in the Attack, *see* Ex. 1 at 34. Therefore, the Attack was "an act of extrajudicial killing."

### ii. Syria's material support and resources enabled AQI to attempt and carry out extrajudicial killings.

The state-sponsored terrorism exception to the FSIA looks to 18 U.S.C. § 2339A(b)(1) to define "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

*Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 103 (D.D.C. 2019) (quoting 18 U.S.C. § 2339A(b)(1)).

This Court has previously acknowledged Syrian support to Zarqawi and AQI in relation to other acts of terrorism. *See Foley*, 249 F. Supp. 3d at 192 (finding that "Syria provided material support to the Zarqawi Terrorist Organization throughout the relevant time period—

roughly 2002 through 2006"); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 68 (D.D.C. 2008) ("Syria served as Zarqawi's organizational and logistical hub from 2002 to 2005"); *Thuneibat*, 167 F. Supp. 3d at 39 (finding that a 2005 suicide bombing was "perpetrated by Zarqawi and AQI, who received material support from" Syria").

The Attack was yet another product of Syria's support to Zarqawi and his allies. Plaintiffs have retained Dr. Daveed Gartenstein-Ross of Valens Global to testify as an expert witness regarding Syria's material support to terrorist groups. Given the evidentiary challenges typically facing plaintiffs in terrorism cases, such expert reports "can be of critical importance." *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 276 (D.D.C. 2016).

Dr. Gartenstein-Ross has dedicated his professional life to studying the role of violent non-state actors such as AQI. He holds a Ph.D. and M.A. in World Politics from the Catholic University of America; a J.D., *magna cum laude*, from New York University School of Law; and a B.A. with Honors, *magna cum laude*, from Wake Forest University. Ex. 1 at 5. With nearly thirty years of experience researching, teaching, and advising, Dr. Gartenstein-Ross is uniquely qualified to speak on issues regarding violent non-state actors. *See id.* at 3–11. He has provided high level briefings, trained officials and analysts, and delivered numerous written open-source strategic reports about sub-state violence as a Subject Matter Expert for the United States Customs and Border Patrol and several other organizations. *Id.* at 5–6.

Dr. Gartenstein-Ross is the Senior Advisor on Asymmetric Warfare at the Foundation for Defense of Democracies, an Associate Fellow at the International Centre for Counter-Terrorism, and the CEO of Valens Global, a private firm focused on fashioning responses to violent non-state actors. *Id.* at 4. He served as Senior Advisor to the Director of the Department of Homeland Security's Office for Community Partnerships and as a Fellow at Jigsaw, a threat-prevention

think-tank within Google. *Id.* at 4–5. Dr. Gartenstein-Ross has qualified as an expert witness on the Zarqawi organization on at least five occasions. Ex. 1 at 6–7. He also served as an expert witness in several other cases involving the activities of other terror groups, such as al Qaeda, Asaib Ahl al-Haq, al-Shabab, and the Taliban. *Id.* at 7–8. Notably, in 2019, the United States Court of Appeals for the Fourth Circuit recognized Dr. Gartenstein-Ross' "extensive credentials and areas of expertise" and affirmed his capability to serve as an expert witness in such cases. *Id.* at 7.

Accordingly, Plaintiffs' proffer Dr. Gartenstein-Ross as an expert witness on the topics of violent extremist movements claiming inspiration from Islam and, more specifically, on Syria's historical relationship with and support of the Zarqawi organization.

In his report submitted for this case, Dr. Gartenstein-Ross draws four critical conclusions:

> (1) Al-Qaeda in Iraq was responsible for the attack on the Al Sadeer Hotel that occurred on March 9, 2005;
>
> (2) The Syrian Arab Republic materially supported the Zarqawi organization/al-Qaeda in Iraq, both actively and tacitly, and possessed a clear and explicit rationale for supporting the designated terrorist group;
>
> (3) Syria's material support for the Zarqawi organization/al-Qaeda in Iraq was causally connected to the group's ability to carry out the Al Sadeer Hotel Attack;
>
> (4) It was foreseeable to the Syrian Arab Republic that the Zarqawi organization/al-Qaeda in Iraq would engage in activities like those at issue in the present case.

*Id.* at 3. The bases for these findings are explained below.

### 1.    *Syrian Support to AQI*

Syria's aid to Zarqawi's organization ran the full gamut of "material support" as it is defined in 18 U.S.C. § 2339A(b)(1)—including currency, lodging, training, expert advice or

assistance, safehouses, facilities, weapons, explosives, personnel, and transportation. As a foreseeable (and even desired) result of this support, AQI was able to execute the Attack.

To illuminate the relationship between Syria's support to various terror groups and the Attack, Dr. Gartenstein-Ross traces Syria's material support to AQI from 2002 to 2008. *Id.* at 22. In doing so, he demonstrates that the Attack "represents a continuity in state policy that continued in the years following the attack." *Id.*

> a.    *Syria provided transportation to AQI.*

Syria served as a critical transit point for AQI fighters and resources. *See* 18 U.S.C. § 2339A(b)(1) (material support includes any "service . . . and transportation"). Syrian security forces assisted AQI with smuggling operations, allowing AQI personnel to freely move across the Iraq-Syria border. *Id.* at 22–28. In addition to being a "permissive operating environment" for AQI operatives, Syria was the "primary transit point for militants heading to Iraq." *Id.* at 22. Dr. Gartenstein-Ross points to numerous, verified accounts of this. *See id.* at 22–32. Secretary Rumsfeld accused Syria of trafficking "busloads of people" and "allowing military supplies to be transported across its border to Iraq" as early as March 2003. *Id.* at 23.

As the former Syrian Ambassador to Iraq and regime defector Nawaf Fares would later recount, he and other Syrian officials participated in an operation to smuggle jihadist volunteers into Iraq after the 2003 invasion. *Id.* at 28. In a 2012 interview, he revealed:

> All Arabs and other foreigners were encouraged to go to Iraq via Syria, and their movements were facilitated by the Syrian government. As a governor at the time, I was given verbal commandments that any civil servant that wanted to go would have his trip facilitated, and that his absence would not be noted.

*Id.* After reviewing a series of AQI documents confiscated by U.S. forces in 2007 (dubbed the "Sinjar records"), the Combating Terrorism Center at West Point released a report the following

year, concluding that "the Syrian government has willingly ignored, and possibly abetted, foreign fighters headed to Iraq. Concerned about possible military action against the Syrian regime, it opted to support insurgents and terrorists wreaking havoc in Iraq." *Id*. at 25. Abo Moaz, a Syrian intelligence officer, personally transported AQI leaders across the Iraqi border to the Rawha Training camp, "where almost all of Zarqawi's senior officers who led his organization in 2003-2004 were trained." *Id*. at 31; *Gates*, 580 F. Supp. 2d at 59 (D.D.C. 2008).

### b. Syria provided training to AQI.

Syria regularly offered its own officials or commissioned individuals to help fulfill AQI objectives. President Assad's brother-in-law, Assif Shawkat, is reported to have run an al-Qaeda training camp on the border of Iraq until it was removed by U.S. forces in 2008. *Id.* at 30. In 2006, the U.S. Treasury named Shawkat a Specially Designated National[4] "for directly furthering the Government of Syria's support for terrorism." *Id*. at 31.

AQI recruiter Abu Qaqa, a cleric who helped found the organization, was "largely considered to be an agent of the Syrian state." *Id.* at 29. Confirmed as "one of dozens" of clerics "commissioned by Syrian Intelligence," he preached at a mosque with the obligatory blessing of the Syrian Ministry, was appointed head of a government-run religious school, and was given a funeral rivaling those of Syrian state officials. *Id*. at 29–30. Most importantly, Abu Qaqa ran an AQI training camp in Syria with the explicit approval of Syrian intelligence. *Id.* at 30.

### c. Syria provided weapons to AQI.

In March 2003, Secretary Rumsfeld stated that the U.S. had "information that shipments of military supplies have been crossing the border from Syria into Iraq, including night-vision goggles. . . . These deliveries pose a direct threat to the lives of coalition forces. We consider

---

[4] Specially Designated Nationals are individuals and companies sanctioned by the U.S. Department of Treasury for activities posing a threat to U.S. national security and foreign and economic policy.

such trafficking as hostile acts." *Id.* at 23. In 2003, President Assad appointed Fawzi Mutlaq al Rawi as the head of the Iraqi wing of the Syrian Ba'ath Party. *Id*. at 30. The U.S. Treasury Department designated al Rawi for providing "financial and material support to AQI," including weapons. *Id*. Dr. Gartenstein-Ross describes al Rawi as completely committed to any objective of the Syrian regime, having "supported whatever groups the regime wanted him to." *Id.*

The Iraqi government publicly condemned Syria's continuous supply of AQI with weapons, financing, and transport. *See id*. at 31–32. In 2009, Iraqi Prime Minister Maliki aired a video of an AQI militant who confessed that he "launched gun attacks on police checkpoints in Diyala, kidnap[ed] Iraqi officers and extort[ed] money for their release or killed them with knives and set up suicide bombings," further accusing Syrian intelligence agents of equipping jihadists to carry out these attacks. *Id*. Later that year, the Iraq defense minister revealed that "most of the weapons seized by his ministry's forces" were traced to Syria. *Id.* at 32.

*d.*     *Syria provided personnel to AQI.*

Syria provided an ongoing stream of fighters to AQI over the years. In September 2003, Ambassador L. Paul Bremer, provided testimony to the House International Relations Committee that "out of the 278 third-country nationals who were captured by coalition forces in Iraq, the 'single largest group are Syrians.'" *Id.* at 23–24.

Due to the concerning flow of insurgents from Syria, Congress passed the Syrian Accountability and Lebanese Sovereignty Restoration Act. *Id.* at 24. The Act demanded that Syria "immediately and unconditionally stop facilitating transit from Syria to Iraq of individuals, military equipment, and all lethal items," and "cease its support for 'volunteers' and terrorists who are traveling from and through Syria into Iraq to launch attacks." *Id*. The 2005 U.S. State Department Country Report described the impact of these foreign fighters as "dramatic." *Id*.

> e.    *Syria provided safehouses to AQI operatives.*

Syria was a "safe haven" for AQI operatives. *Id.* at 26. For example, in 2005, the U.S. Treasury Department designated Abu al-Ghadiyah for acting as Zarqawi's financier and "recruiting and dispatching terrorist operatives" in Jordan and Iraq. *Id.* at 26–27. He was able to do so due to Syria's loose reign on AQI operatives. *Id.* Another designation addresses the role of Badran Turki Hishan al-Mazidih, AQI's Syrian commander for logistics from approximately 2004 until 2008. *Id.* at 27. He was designated because he "obtained false passports for foreign terrorists, provided passports, weapons, guides, safehouses, and allowances to foreign terrorists in Syria and those preparing to cross the border into Iraq." *Id.*

Syrian military bases were used to train and house AQI members. By intentionally providing Zarqawi's organization with leeway to flourish in Syria, Syria became known as "a facilitation hub for terrorist groups operating in Iraq." *Id.* at 24. In the words of a defector from the Syrian regime, "Bashar al-Assad and his security forces are directly responsible for the killing of thousands and thousands of Iraqis and coalition forces, because he gave al Qaeda everything it needed. He trained and provided shelter and he built safe havens for them to hide in." *Id.* at 28. One of these "safe havens" included the Syrian border village of al Sukariya, near the border city of Abu Kamal and only minutes from the Iraqi border. *Id.*

> f.    *Syria provided other forms of support to AQI.*

Syria also provided lodging, financial services, and loosened visa and documentation restrictions for AQI affiliates. For example, after Zarqawi's release from an Iranian prison in 2002—courtesy of a Syrian passport—Zarqawi returned to Syria where he arranged financing from the Syrian government, recruited operatives, trained in Syrian facilities, and planned further attacks within Iraq. *Id.* Fighters heading from Syria to Iraq were provided disingenuous passports

and identification cards. *Id*. at 23 ("…[an AQI trafficker's] ID was a bit of cardboard he presented each month to his minders"). Moreover, Syria presented itself as an appealing venue for terror activities by refusing to require certain visitors to maintain a visa and by facilitating a cash economy. *Id*. at 24.

       2.    *Syria's material support of AQI proximately caused the Attack*

It is Dr. Gartenstein's professional opinion that "Syria's material support for the Zarqawi organization/al-Qaeda in Iraq was causally connected to the group's ability to carry out the Al Sadeer Hotel Attack." *Id*. at 3. This opinion is underscored by the "complex operations required to carry out the [Attack]," in conjunction with Syria's "track record of supporting the Zarqawi organization in Iraq." *Id*. at 42. He concludes that there are several unique causal connections between Syria's support for AQI and the Attack. *See id.* at 42–44.

First, Syria boosted the personnel available to AQI by creating a "Syrian pipeline" for fighters through Syria into Iraq. *Id*. at 43. By providing the financial backing for this pipeline, and serving as a transit point, Zarqawi was able to build the vast network of fighters needed to carry out large-scale attacks. *Id*.

Second, Syria served as a major transit point for more than just fighters. It enabled the smuggling of money, weapons, and supplies into Iraq. *Id*. According to Dr. Gartenstein-Ross, this contributed to AQI's ability to execute the Attack "with up to five attackers (including two suicide bombers), equipment (e.g., garbage truck, uniform disguises, video camera), firearms, and a large quantity of explosives." *Id*.

Third, Syria's provision and funding of sanctuary to AQI operatives allowed the group to maintain "sophisticated pre-attack surveillance from both a personnel and professionalization perspective." *Id*. Syria served as a "logistical hub" for AQI members to plan attacks in Iraq and

recruit other fighters. *Id*. Syria also made its own government resources available to Zarqawi's team, allowing AQI operatives to train in Syrian military facilities and helping them arrange financing. *Id*. Syria's support elevated the quality of training and planning available to AQI, increasing its ability to successfully carry out complex schemes like the Attack. *Id*.

Moreover, Syria's backing provided a measure of confidence to AQI that encouraged it to consider large-scale bombings on Western targets. *Id*. Given Syria's shared motivations in pushing the United States to withdraw, AQI was freely able to carry out these attacks because it knew it shared a common enemy with its sponsor. *Id*. Large scale operations like the Attack were more likely to garner praise and encouragement from Syria than condemnation.

In sum, Dr. Gartenstein-Ross opines that Syria "provid[ed] AQI with the infrastructure and resources it needed to carry out an operation like the Al Sadeer Hotel attack." *Id*. He concludes that "given Syrian support, it was foreseeable that AQI would carry out such an operation, as it had done so repeatedly before March 9, 2005, and had explicit reasons for doing so." *Id*. at 43–44. Syria's significant and longstanding provision of funding, lodging, tactical training, expert advice or assistance, safehouses, facilities, weapons, explosives, personnel, and transportation to AQI are more than sufficient to constitute the provision of material support towards the Attack as defined in 18 U.S.C. § 2339A(b)(1).

3.    *The Attack was a foreseeable and desired result of Syria's support.*

Central to Dr. Gartenstein-Ross' conclusion that Syria backed the Attack is the "explicit rationale" for sponsoring various insurgent groups, including AQI, expressed by Syrian officials against the U.S. presence in the Middle East. *Id*. at 32. Syrian officials clearly articulated their view that an American-backed democracy in Iraq was a threat to its own regime. *See id*. In 2003, the Foreign Minister of Syria publicly stated that "Syria has a national interest in the expulsion of

the invaders from Iraq." *Id*. at 22. In fact, the "Assad regime *continually prioritized* expelling Americans from the Middle East." *Id*. at 32 (emphasis added). Syria noted that groups like AQI shared this same sentiment, spurring them to utilize terrorism as a "proxy tool." *Id*.

Dr. Gartenstein-Ross identifies three central policy objectives driving the Syrian government's support of AQI and other terror groups: (1) to bog down the U.S. military in Iraq; (2) to allow the Iraq conflict to serve as an outlet for domestic jihadists, thus preventing them from causing trouble at home; and (3) to be one of the few Arab governments to sanction armed opposition to the American presence in Iraq. *Id*. As discussed below, *infra* Section IV, Syria has long used terrorism as a means of reaching these types of policy goals.

Therefore, Dr. Gartenstein-Ross concludes that "Syria should have understood that attacks like this were one of the risks produced by its support of the Zarqawi organization." *Id*. at 44. It was particularly foreseeable that AQI would use Syria's support to (1) target Americans; (2) target foreign contractors; and (3) execute complex attacks, including large hotel-based suicide bombing operations. *Id*. Dr. Gartenstein-Ross points to the Zarqawi organization's historical, "well established" reasons for executing attacks in this manner. *See id*. at 44–51.

### iii.    The Attack resulted in personal injury.

The Victim Plaintiffs' injuries are established through the uncontroverted sworn written testimony of the victims themselves and their families. Exs. 4–9. These specific personal injuries are identified and discussed in detail below, *infra* Section VII.A.

Because Plaintiffs' claims against Syria satisfy each element of FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(a), Syria is not protected by the doctrine of sovereign immunity. Therefore, this Court has subject matter jurisdiction over Plaintiffs' claims for relief. *See* 28 U.S.C. § 1330(a).

### B.     <u>Personal Jurisdiction</u>

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for subject matter jurisdiction. The second element is also satisfied because Syria was properly served.

Title 28, Section 1608 prescribes the four methods of obtaining proper service in FSIA cases. *See* U.S.C. § 1608(a)(1)–(4). Each must be attempted in ascending order, but only to the extent feasible in a specific case or applicable to a specific defendant. *Id.* The first two methods—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention,"—do not apply here. Plaintiffs have no "special arrangement" for service with Syria, and Syria is not party to any "international convention on service of judicial documents." *See Thuneibat*, 167 F. Supp. 3d at 37. Plaintiffs therefore proceeded with the next two steps, via mail pursuant to 28 U.S.C. § 1608(a)(3), and then diplomatic service via the U.S. Department of State as directed by 28 U.S.C. § 1608(a)(4).

Plaintiffs initiated service of the *Messina* Complaint by mail on June 8, 2020, ECF No. 7, and the Clerk's Office indicated its inability to effect service on June 9, 2020. ECF No. 9. After waiting the requisite thirty days, Plaintiffs filed a Notice of Failed Service, ECF No. 8, and initiated diplomatic service on July 16, 2020, ECF No. 9. Syria was formally served with the *Messina* Complaint on November 23, 2020. ECF No. 12.

Plaintiffs initiated service of the *Hassler* Complaint by mail on February 16, 2021, *Hassler*, ECF No. 6, and the Clerk's Office noticed its inability to effect service on March 3, 2021, *Hassler*, ECF No. 8. After thirty days, Plaintiffs filed a Notice of Failed Service, *Hassler*,

ECF No. 9, and then initiated diplomatic service on April 9, 2021, *Hassler*, ECF No. 10. Syria

was formally served with the *Hassler* Complaint on August 9, 2021. *Hassler*, ECF No. 13.

Thus, because this Court has subject-matter jurisdiction over this matter, *see supra*

Section V.A, and since Plaintiffs fully complied with the service requirements of Section

1608(a), this Court has personal jurisdiction over Syria in this matter. *See* 28 U.S.C. § 1330(b).

## VI.    THEORIES OF LIABILITY

With jurisdiction established, liability in FSIA cases may be determined in a variety of

ways. Historically, the FSIA was not interpreted to create a federal cause of action, but rather to

operate as a "pass-through" for state law claims. *See Owens*, 864 F.3d at 763; *Cicippio-Puelo v.*

*Islamic Republic of Iran*, 353 F.3d 1024, 1033 (D.C. Cir. 2004). The FSIA was amended in 2008

to explicitly authorize the federal cause of action now found in Section 1605A(c), but this

amendment "did not upset the prior law permitting plaintiffs to assert state law claims after

clearing the hurdle of foreign sovereign immunity." *Fritz*, 320 F. Supp. 3d at 89 (citing *Owens*,

864 F.3d at 807–09); *see W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 138 (D.D.C.

2019) ("the creation of a federal cause of action in § 1605A(c) did not revoke Plaintiffs' ability

to recover pursuant to state law causes of action").

Therefore, plaintiffs may pursue either the federal cause of action or state law causes of

action after establishing jurisdiction. The appropriate method often depends on the status and

nationality of each individual plaintiff. For the Victim Plaintiffs and their family members of

American nationality, liability can be directly assessed through the federal cause of action

established by Congress in 28 U.S.C. § 1605A(c). On the other hand, for family member

plaintiffs of foreign citizenship, state law causes of action are required, commonly D.C. law. *See,*

*e.g.*, *W.A*, 427 F. Supp. 3d at 139.

**A.**     **Syria is Liable pursuant to Section 1605A(c) for the Injuries of the Victim Plaintiffs and the U.S. National Family Members**

For an American citizen, or a victim employed by the U.S. Government, "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Fritz,* 320 F. Supp. 3d at 86–87, (quoting *Foley*, 249 F. Supp. 3d at 205). Such a plaintiff who proves the requirements for waiving sovereign immunity "has also established entitlement to relief as a matter of federal law." *Id*.

Here, the elements of the 1605A(c) cause of action are all met: (1) Syria was designated as a state sponsor of terrorism at the time of the Attack and remains so designated today, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://bit.ly/3LGVGBZ; (2) Tamara, Russell, and Steven, and their families, are all American citizens, and although Louis is not a citizen, he was employed on contract with the U.S. government and acting within the scope of his job duties at the time of the Attack; and (3) money damages are sought for injuries caused by the Attack.

Although it has been held that satisfying these three elements is sufficient to establish liability under this federal cause of action, some courts have also required that each plaintiff be able to show that their claims also satisfy the framework of at least one common law tort. If this Court wishes to proceed with its analysis in that manner, the evidence is sufficient to meet traditional standards for assault, battery, and intentional infliction of emotional distress.

A defendant is liable for assault when it acts "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact with those attacked and those attacked were thereby put in such imminent apprehension." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 80 (D.D.C. 2017) (quoting RESTATEMENT (SECOND) OF TORTS § 21(1)). The very definition of terrorism involves "the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal." *Id.* (citing Terrorism, Merriam-Webster

Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism). A violent act, combined with testimony that a plaintiff "felt and continues to feel anxiety as a result of the [bombing] attack," is enough to satisfy the elements for assault. *Id.* Syria's material support and training for AQI, combined with the nature of this large-scale truck bombing, clearly exemplifies the desire to "cause harmful or offensive contact." *See id.* The Victim Plaintiffs' accounts regarding the terror of that day, and its continuing aftermath, underscores their awareness of imminent harm and the impact of that fear on their lives. *See* Section VII.A. Therefore, the Victim Plaintiffs' claims meet the general principles of tort law for a claim of assault.

A claim for battery is similar to one for assault, except that "a harmful contact" must "directly or indirectly result[]." *Braun*, 228 F. Supp. 3d at 80 (quoting RESTATEMENT (SECOND) OF TORTS § 13). Something amounts to "harmful contact" when it results in "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 15). Because the bombing directly resulted in physical harm to each of the Victim Plaintiffs, a "harmful contact" is clearly established. *See* Ex. 4 ¶¶ 11–20; Ex. 5 ¶¶ 28–29; Ex. 6 ¶¶ 7–14; Ex 7 ¶¶ 25–29. These physical impacts are sufficient to permit the Victim Plaintiffs to advance under a battery theory.

The American family member plaintiffs, Richard Hassler and Barbara Curry, are the father of Tamara Hassler and the wife of Russell Curry, respectively. *See* Ex. 6 ¶ 2; Ex. 9 ¶ 3. Having established an immediate familial relationship, their liability claims are wholly derivative of the Victim Plaintiffs. In the event this Court wishes to further analyze these claims through the lens of "well-established principles of [tort] law," the Family Member Plaintiffs also meet the common law tort theory standards for intentional infliction of emotional distress as set forth in the RESTATEMENT (SECOND) OF TORTS. *Braun*, 228 F. Supp. 3d at 78.

A defendant is generally liable for intentional infliction of emotional distress if it, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to the plaintiffs." *Id.* at 81 (quoting RESTATEMENT (SECOND) OF TORTS § 46(1)). The nature of the act element is satisfied in the Attack because "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C.2009). By the same token, providing weapons, funding, and training, particularly to an organization like AQI, is also extreme and outrageous. *See Braun*, 228 F. Supp. 3d at 81. The emotional toll includes not only the mental anguish from learning of the Attack, but also the negative impact of the victim's injuries on their family members. The Attack and its foreseeable consequences did in fact cause severe emotional distress to Richard Hassler and Barbara Curry. *See* Exs. 6, 8–9.[5]

Because the Victim Plaintiffs and their American family members meet the three elements required for recovery under Section 1605A(c), and their claims can be expressed consistently with accepted principles of common law torts, the Court should find in their favor as to liability.

**B.**     **Syria is Also Liable to Family Member Plaintiffs of Foreign Citizenship**

In circumstances where the federal cause of action is either not available to or not advanced by a particular plaintiff, the Court must first determine what substantive law applies. Here, that is true of Angelique Messina and V.M., the wife and daughter of Louis, because they are not American citizens and therefore cannot succeed under Section 1605A(c).

---

[5] The fact that family members were not present for the Attack does not block their opportunity for recovery. *See Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010) (finding that plaintiffs "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result"); see also *Salazar*, 370 F. Supp. 2d at 115 n. 12 (stating that "Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families").

In the District of Columbia, federal courts addressing FSIA claims "apply the choice of law rules of the forum state." *Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 153-54 (D.D.C. 2011), *aff'd in part and vacated in part on other grounds,* 864 F3d 751 (D.C. Cir. 2017). The forum for the present matter is the District of Columbia.

> ### i.   D.C. Law Should Apply to the Foreign Family Member Plaintiffs' Claims

The District of Columbia blends a "governmental interest analysis" with a "most significant relationship test." *Fritz,* 320 F. Supp. 3d at 89 (quoting *Oveissi,* 573 F.3d at 842). Under the governmental interest analysis, this Court should evaluate "the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Rest. Corp.*, 566 A.2d 31, 40-41 (D.C. 1989).

The "most significant relationship test" requires the consideration of four factors set forth in the Restatement (Second) of Conflict of Laws: (1) "the place where the injury occurred;" (2) "the place where the conduct causing the injury occurred;" (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties;" and (4) "the place where the relationship, if any, between the parties is centered." *See id.* (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)). Consideration should also be given to the needs of international systems, the relevant policies of the forum, predictability, certainty and uniformity of result, and ease in the determination of the law to be applied. *See Dammarell v. Islamic Republic of Iran*, Case No. 1:01cv2224, 2005 WL 756090, at *18 (D.D.C. Mar. 29, 2005).

In the FSIA context, as a general rule, the law of the forum governs "unless the foreign state has a greater interest in the controversy." *Owens,* 826 F. Supp. 2d at 154. This Court has previously applied District of Columbia law instead of the law where the injury occurred (here,

Iraq) or the law where the plaintiffs happen to reside (here, South Africa). For example, in *W.A.*, the Court listed several reasons why the United States had a "unique interest" in "having its own laws apply in litigation involving acts of terrorism." *W.A.*, 427 F. Supp. 3d at 139. Because acts of terrorism are designed to "weaken United States' interests and policies abroad," the court held that "the law of the forum state, the District of Columbia, should provide the rule of decision" so as to (1) promote uniformity of law, and (2) to "extend access to U.S. federal courts" for foreign citizen family members of victims of terrorism. *Id*.

This same reasoning has a long history of consistent application. In *Owens,* this Court applied D.C. law rather than the law of the countries where the U.S. embassy bombings at issue occurred, finding that the United States had a "unique interest" in having its domestic law apply in terrorism cases, especially those directed against American interests. 826 F. Supp. 2d at 155. Similarly, in *Dammarell*, this Court applied D.C. law in a case involving an attack on the U.S. Embassy in Beirut. 2005 WL 756090, at *18. And in *Fritz*, this Court emphasized the same "unique interest" of the United States and concluded that "the seat of the federal government" should provide the substantive law in such a case. 320 F. Supp. 3d at 91.

For the same reasoning, this Court should apply D.C. law to the claims of Angelique Messina and V.M., the foreign national family members in this case.

District of Columbia law provides a cause of action for foreign family member plaintiffs that is the functional equivalent of the solatium damages available under 28 U.S.C. § 1605A(c). In fact, this was specifically affirmed upon a certified question to the D.C. Court of Appeals. *Republic of Sudan v. Owens,* 194 A.3d 38, 42 (D.C. 2018). Accordingly, in the same manner as the American family members established their liability claims, the foreign national family members have a claim for intentional infliction of emotional distress.

More specifically, to establish a *prima facia* case of intentional infliction of emotional distress under D.C. law, a plaintiff must establish: (1) extreme and outrageous conduct on the part of the defendant which, (2) either intentionally or recklessly, (3) caused the plaintiff to suffer severe emotional distress. *Larijani v. Georgetown Univ.,* 791 A.2d 41, 44 (D.C. 2002).

First, acts of terrorism, "by their very definition," amount to extreme and outrageous conduct. *Valore,* 700 F. Supp. 2d at 77 (D.D.C. 2010); *Mwila v. Islamic Republic of Iran,* 33 F. Supp. 3d 36, 40 (D.D.C. 2014). Second, as set forth in the jurisdictional section regarding 28 U.S.C. § 1605A, *see supra* Section V.A., Syria's conduct exhibited a purposeful support for violence. Finally, the Attack caused Angelique and V.M. incredible distress, including the fear of the impact of Louis' injuries on their family. *See infra* Section VII.B. This anguish has had lasting, irrevocable effects on the Messina family.

Accordingly, Angelique and V.M. have a valid cause of action under D.C. law for intentional infliction of emotional distress that is comparable to the solatium claims available to the other family member plaintiffs.

### ii. Alternatively, Syria is Liable to Family Member Plaintiffs of Foreign Citizenship under Iraqi Law.

Should the Court choose to emphasize the second factor of the "most significant relationship test" i.e., "the place where the conduct causing the injury occurred," the likely choice of law applied would be that of Iraq, but the foreign family members would still prevail.

Plaintiffs retained Mr. Mohammed Juma Abed to discuss recovery for emotional distress under Iraq law by family members of terrorism victims. *See* Expert Witness Report of Mohammed Juma Abed, attached as "Exhibit 2." In addition to nearly two decades of legal experience, Mr. Abed participated in the drafting of the USAID Iraq Access to Justice legal handbook, provided legal education workshops during the drafting of Iraq's compensation laws

for victims of terrorism, and served as a consultant on issues of Iraqi law in the media. *Id.* ¶ 2. Plaintiffs proffer Mr. Abed as an expert on Iraqi law.

It is Mr. Abed's opinion that "the concept of moral damage in civil liability under Iraqi law would allow immediate family members of those targeted by terrorist attacks a claim for relief under Iraqi law for the injuries to their loved ones as well as their own emotional distress." *Id.* ¶ 6. He describes "moral damage" as akin to what U.S. law considers emotional distress; an injury to the "non-financial interests of an individual." *Id.* ¶ 7. This can include "damages resulting from injuries upon a family member," and injuries to "feelings, emotions, and/or the dignity of another." *Id.*

Iraqi law requires proof of (1) a harmful act, and (2) a causal relationship to the plaintiff's damages. *Id.* ¶ 8. It is Mr. Abed's opinion, to a reasonable degree of professional certainty, that the Iraqi standard for this rule "could be satisfied by an individual who suffered emotional distress due to a terrorist attack against an immediate family member." *Id.* Given that both a harmful act and causal connection have been established in this instance, Angelique Messina and V.M. would be able to recover for their emotional distress stemming from the Attack under a choice of law analysis adopting Iraqi law.

### iii.     Alternatively, Syria is Liable to Family Member Plaintiffs of Foreign Citizenship under South African Law.

Likewise, if the Court chooses to emphasize the third factor of the "most significant relationship test," i.e., "the domicile, residence, nationality, place of incorporation and place of business of the parties," Plaintiffs Angelique Messina and V.M. would still have a cause of action under South African law, their domicile and place of nationality.

Accordingly, Plaintiffs sought out Tzvi Brivik, an attorney with over twenty years of experience in litigating personal injury claims in South Africa. It is Mr. Brivik's opinion that

South African courts do "recognize an action in delict for damages caused by intentional or negligent infliction of emotional shock." Expert Witness Report of Tzvi Brivik, attached as "Exhibit 3," ¶ 15. Moreover, Mr. Brivik also determined that in South Africa, "courts will exercise a wide discretion in quantifying a plaintiff's damages." *Id.*

In fact, Mr. Brivik states that, "It is trite South African law that an action in delict may lie for patrimonial loss or sentimental damage cause by intentional or negligent infliction of emotional shock." *Id.* ¶ 3. South African law defines "emotional shock" as a "shock suffered by a person without necessarily sustaining bodily injury, caused when a third party observes or is mortified by an unpleasant or disturbing event, e.g., the killing of a relative or a person with whom the third party had a close emotional relationship." *Id.* ¶ 4. Such claims do not necessarily require that the plaintiff personally observe the circumstance causing the shock. *Id.* ¶ 6. The impact on the individual claiming emotional shock must be "of more serious adverse physical or mental sequelae" in order to claim damages. *Id.* ¶ 7.

Accordingly, Mr. Brivik identifies the following as requirements for "delictual liability" in cases involving emotional shock: (1) a voluntary act causing another emotional shock (including the detonation of dynamite), (2) a causal nexus between the act and harm, (3) wrongfulness, e.g., a "relatively serious physical or mental harm," (4) fault, and (5) damage in the form of physical or mental harm. *Id.* ¶ 11.

All five of these requirements are met in this instance: (1) Syria's material support to AQI and the bombing constitutes a voluntary act; (2) Dr. Gartenstein-Ross has confirmed a causal connection between Syria's support and the Attack; (3) the attack resulted in extrajudicial deaths and harm to Victim Plaintiffs; (4) Syria is at fault; and (5) Angelique Messina and V.M. have suffered significant harm as a result.

Therefore, because the result is the same regardless of the law applied, Angelique

Messina and V.M. can recover for their emotional distress stemming from the Attack under D.C.

law. *See Beach TV Properties, Inc. v. Solomon*, 306 F. Supp. 3d 70, 92 (D.D.C. 2018) (when

"there is no 'true conflict' . . . D.C. courts will "apply the law of the District of Columbia").

## VII.   DAMAGES

The FSIA terrorism exception specifies that Plaintiffs may recover "economic damages,

solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). In *Valore*, this court

confirmed that "those who survived the attack can recover damages for their pain and suffering,

as well as any other economic losses caused by their injuries . . . family members can recover

solatium for their emotional injury; and all plaintiffs can recover punitive damages." 700 F.

Supp. 2d at 83. Each of these types of recovery will be addressed below.

### A.   <u>Pain and Suffering</u>

Awards for pain and suffering "are determined based upon an assessment of such factors

as to the severity of the pain immediately following the injury, the length of hospitalization, and

the extent of the impairment that will remain with the victim for the rest of his or her life."

*Winternitz v. Syrian Arab Republic*, Case No. 1:17cv2104, 2022 WL 971328, at *10 (D.D.C.

Mar. 31, 2022) (citing *Valore*, 700 F. Supp. 2d at 83–84). For individuals who survive terrorist

attacks, courts have adopted a baseline award of $5 million. *Id*. (indicating that this baseline has

been applied to injuries ranging from broken bones to "lasting and severe psychological harm").

#### i.   **Pain and Suffering of Louis Messina**

The morning of March 9, 2005, Louis awoke to the sound of small weapons firing near

the Al Sadeer hotel. Affidavit of Louis Messina, attached as "Exhibit 4," ¶¶ 4–5. When he

looked out his hotel window to investigate, he realized the hotel was under a "small arms fire

attack" and observed a garbage truck heading towards its perimeter. *Id*. ¶ 6. After this, Louis lost consciousness: "I can only remember a blinding white light and later regaining consciousness somewhere else on the ground floor." *Id*. ¶ 7. In a subsequent moment of lucidity, Louis recalls being on the floor, vomiting. *Id*. His next memory was waking up in the combat support hospital as medics sowed a cut above his right eye. *Id*. ¶ 8. He recalls having a brief phone call with his wife sometime later but remembers nothing of the conversation. *Id*. ¶ 9 The next days were a complete blur as he was shuttled between the hotel and the hospital. *Id*. ¶¶ 7–10.

Louis was significantly injured in the Attack. Shrapnel from the explosion lacerated his body, with the worst injuries to his left bicep. *Id*. ¶¶ 11, 15. He sustained nerve damage to the right side of his face, including a deep wound above his right eye causing near total loss of clear vision. *Id*. ¶¶ 11, 14. He has been diagnosed with Chronic Obstructive Pulmonary disease from the smoke and dust from the explosion, causing him difficulty when he breathes. *Id*. ¶ 20.

Louis also sustained severe frontal lobe damage that has altered the trajectory of his life. *Id*. ¶¶ 11–13. Louis experiences seizures and must rely on medication to manage them. *Id*. ¶ 16. He has nightmares, which causes him to avoid sleep. *Id*. ¶ 18. He becomes "violent in an instant," with the lack of sleep exacerbating his "extremely bad temper which [he] cannot control most of the time." *Id*. Occasionally, Louis experiences blackouts where he becomes extremely violent and lashes out, yet retains no memory of his actions during these episodes. *Id*. ¶ 19.

Angelique, Louis' wife, provides her own chilling perspective on how Louis has changed. In addition to the impact of Louis' injuries on her life and their marriage, she has witnessed the dramatic transformation that Louis is unable to fully observe in himself:

> Louis is extremely volatile. He has become extremely aggressive, and his behavior is very erratic. He is unpredictable and continuously wants to kill everyone. He talks in violent terms regularly.

> Louis also has terrible road rage. When he had a motorbike, he
> would smash the driver's side mirror as he went past their car if
> motorists didn't get out of his way quickly enough. He never
> would have behaved this way before the bombing.

Affidavit of Angelique Messina, attached as "Exhibit 8," ¶¶ 12–14. At one point, Louis was

arrested and detained for assault and malicious damage to property. *Id*. ¶ 23. He struggles

immensely with paranoia and is adamant about always having his car keys either in the ignition

of the car or by the front door in case he needs to evacuate suddenly. *Id*. ¶ 19.

After Angelique divorced him, Louis was found "living in the bush like an animal with

no tent, no change of clothes, or other necessities." *Id*. ¶¶ 22–24. His disturbing reaction

propelled Angelique to return to care for him. *Id*. ¶ 25. Nevertheless, Angelique must "limit his

exposure to society" and "keep him away from any opportunities which could lead to devastating

results for him or others." *Id*. ¶ 26. Louis, and those around him, have suffered immeasurably

from the Attack. Plaintiffs request an award of $7,500,000.00 for his pain and suffering.

### ii.    Pain and Suffering of Tamara Hassler

At 6:07 am on March 9, 2005, Tamara Hassler was shaken awake by the sound of

automatic gunfire outside her window. Affidavit of Tamara Hassler, attached as "Exhibit 5," ¶ 4.

Tamara rose to look out the window and as she walked back, an explosion erupted, shattering her

window and splintering the door to her room. *Id.* ¶¶ 5–7. Tamara was thrown backwards into a

pile of glass and she began to feel severe pain in her mouth, as if her front teeth had been

knocked out. *Id.* ¶¶ 7, 12. As she rose to leave her room, she was met with the sound of gunshots

every few seconds and people screaming, tending to their own wounds while checking for others

with more severe injuries. *Id.* ¶¶ 14–18. When Tamara reached the ground level, fire and black

smoke billowed around the whole perimeter of the building. *Id.* ¶¶ 19–20. Chaos ensued for the

next several moments as the automatic gunfire resumed and Tamara tried to coordinate with the guards and assist in securing the area. *Id.* ¶¶ 25–26.

Due in part to the injuries she sustained in the Attack, Tamara was unable to work for nearly two years. *Id.* ¶ 27. During this time, she attended many doctor's appointments and began extensive treatment for her dental injuries, undergoing about six oral surgeries a year for the next six years due to complications from her injuries. *Id.* ¶¶ 28–29. These complications continue to impact her today. *Id.* ¶ 29.

Tamara's struggle with PTSD is still a "very present battle," despite learning to manage the more severe symptoms through extensive therapy and coaching. *Id.* ¶¶ 32, 38. For years, she experienced traumatic flashbacks, followed by bouts of depression, sometimes pushing her to the point of suicidal ideations. *Id.* ¶¶ 31, 34–35. She continues to struggle with her PTSD flaring up when she feels tension with others. *Id.* ¶¶ 32, 39. She no longer feels like herself and must actively work to limit the impact of various triggers. *Id.* ¶ 32. Plaintiffs request an award of $6,000,000.00 for her pain and suffering.

### iii.   Pain and Suffering of Russell Curry

Russell was getting ready for work when he heard gunfire from the guards outside trying to deter the suicide bombers. Affidavit of Russell Curry, attached as "Exhibit 6," ¶¶ 4-5. As he was headed down the third-floor stairs, the bomb exploded, flinging shrapnel metal into his right arm. *Id.* ¶¶ 5–6. In his affidavit, Russell recalls the next few traumatic moments:

> The entire stairwell collapsed on me. I was unable to move because of all the debris that was on me. I was eventually rescued by some personnel on the ground floor. I could not move my arm and could not move my fingers. I had a large ten-inch gash on my right arm that was bleeding severely.

*Id.* ¶¶ 7–8.

An x-ray exam revealed large amounts of shrapnel embedded in his right arm, but the doctors were unable to remove all of it during surgery; he was then flown to Germany and then back to the United States for more intensive medical treatment. *Id.* ¶¶ 10-13. Accordingly, Russell has lost 20% of the use of his right arm due to the injuries he sustained and dons several large scars. *Id.* ¶¶ 14, 16.

Nevertheless, after an intense thirty days of rehab, Russell could not shake the feeling that he had left Iraq with "unfinished business," and determined to return to Iraq to finish his contract. *Id.* ¶ 15. Today, he often wakes up in cold sweats from nightmares about the day of the bombing, but due to his wife's dementia and deteriorating condition, he must cope with these stressful episodes on his own. *Id.* ¶ 17. Plaintiffs request an award of $5,000,000.00 for his pain and suffering.

### iv.    Pain and Suffering of Steven Thomas

Steven had acclimatized to the sound of gunfire while living in Iraq, but on the day of the bombing, it was "too close for comfort." Affidavit of Steven Thomas, attached as "Exhibit 7," ¶ 5. Seeing the approaching garbage truck from the window and realizing something was wrong, Steven dressed and turned to gather his gear. *Id.* ¶¶ 6–8. The truck exploded, hurling him towards the bed and onto the floor as the glass and window frame flew at him. *Id.* ¶¶ 9–12. Deaf, disoriented, and in "excruciating pain," Steven managed to get outside of his room before collapsing. *Id.* ¶¶ 11, 13. Eventually, his survival instincts kicked in and he was able to pick himself up and walk into the hotel hallway. *Id.* ¶ 15. At that point, Steven was unaware of the extent of his injuries, but a friend saw him and immediately picked him up and started carrying him. *Id.* ¶¶ 16–17. After realizing his blood was staining the shirt of his friend and seeing the reactions of others, Steven assumed he was "likely going to die." *Id.* ¶¶ 17–21.

Steven was then transported to the Green Zone for medical treatment. *Id*. ¶ 22. Steven

recalls being placed in a wheelchair and watching as medical personnel did a "double take"

every time they passed by him, causing him to wonder how bad his injuries were. *Id*. ¶ 24. After

being rushed back for x-rays and scans, Steven vividly describes the situation:

> I found myself staring into a bright light as a doctor picked glass
> out of my eye sockets. This was a very painful procedure. I cannot
> remember how many shards of glass were removed from my eyes,
> but I can remember the experience of the doctor extracting the
> glass, one piece at a time, and the excruciating pain in the removal
> of each shard.
>
> I was then moved to another area where a team began to remove
> glass from my entire body. At this point, the pain increased,
> especially when they began to remove the glass from my feet.

*Id.* ¶¶ 26–27. In addition to the glass embedded in his body, Steven also sustained burns on the

side of his face. *Id.* ¶ 28. He was medically discharged the next day and sent back to "what was

left of the Al Sadeer Hotel," where all the doors and windows had been blown out. *Id*. ¶ 30. His

team stayed for the next few days, but at a cost of unbearable anxiety to Steven. *Id.* ¶ 32.

To Steven, the Al Sadeer represents "the worst nightmare [he] had ever experienced." *Id.*

¶ 31. Today, he still suffers from constant ringing in his ears, headaches, and phantom burn pain.

*Id.* ¶ 35. He is constantly on edge: smells, noises, and hotels "all take [him] back to that day." *Id.*

¶¶ 36–38. His inability to sleep has prevented him from working or feeling any semblance of

normalcy, causing his marriage of twenty years to end in divorce. *Id.* ¶¶ 37, 41. After the Attack,

he was unable to sleep in the same bed as his wife, speak to her about his pain, or otherwise cope

with the changes to his life. *Id*. ¶ 41. There is not a day that goes by without Steven thinking

about the Attack as he relives the experience "every day" of his life and has "never gotten over

this." *Id.* ¶¶ 39, 41–43. Plaintiffs request an award of $5,000,000.00 for his pain and suffering.

B.    <u>Solatium Damages</u>

Each family member advances either a solatium claim pursuant to Section 1605A(c) or an equivalent cause of action for intentional infliction of emotional distress. Those "in direct lineal relationships are presumed to suffer damages for mental anguish insofar as '[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.'" *Bova v. Islamic Republic of Iran*, Case No. 1:15cv1074, 2020 WL 2838582, at *6 (D.D.C. May 31, 2020) (quoting *Belkin*, 667 F. Supp. 2d at 22). These damages are not easily quantifiable, so "Courts look for guidance, therefore, in prior decisions." *Id.*

Solatium claims are generally defined as compensation for "mental anguish, bereavement and grief." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011). A solatium claim is "nearly indistinguishable from a claim for IIED."[6] *Flanagan*, 87 F. Supp. 3d at 115. This Court utilizes a framework for calculating such damages that suggests awards of four million for spouses, two and a half million for parents and children, and one and a half million for siblings. *Oveissi*, 768 F. Supp. 2d at 26 n.10; *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010).

Although this framework is widely recognized as the presumptive approach, its suggested figures "are not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). This Court has discretion "to grant solatium awards based on the particular facts of each case." *Blank v. Islamic Republic of Iran*, No. CV 19-3645 (BAH), 2021 WL 3021450, at *12 (D.D.C. July 17, 2021) (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 351 (D.C. Cir. 2018)). The Court may award more in cases "with aggravating circumstances," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006), such as "an

---

[6] It is because of this equivalence that it is reasonable for the Court to analyze the damages claims of foreign national family members in the same manner as those of American family members.

especially close relationship" with the victim, "medical proof of severe pain, grief or suffering on behalf of the claimant," or that the circumstances of the attack made the plaintiffs' "suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

### i.    Emotional Distress of Angelique Messina and V.M.

Before the Attack, Louis' wife, Angelique Messina had a happy and healthy relationship with Louis. *See* Ex. 8 ¶ 7. Today, Louis is completely dependent on his wife and unable to function in society on his own. *See id.* ¶ 26. Angelique does not see the "loving, caring person" she married over thirty years ago. *Id.* ¶ 7. Louis' severe depression and volatile temper have prevented the family from being able to socialize with others and deepened their own struggles with severe depression because of the home environment. *Id.* ¶¶ 10, 26.

Learning to cope with Louis' new demeanor has created a nearly unbearable home environment for the Messina family. In 2006, Angelique and Louis' oldest daughter ran away from home, only calling her mother to say she could no longer handle her father's outbursts. *Id.* ¶ 20. She has had no contact with the family since then, and Louis has "completely shut her out of his mind." *Id.* ¶ 21. Angelique and Louis can no longer share a bed or a room together due to his violent outbursts from nightmares or hallucinations. *Id.* ¶ 18. Louis' near complete lack of self-control, coupled with his inconsolable fits of rage, pushed Angelique to divorce him in 2013. *Id.* ¶ 22. Angelique returned to Louis in order to take care of him, but she is now permanently on antidepressants and is all but completely isolated from society. *Id.* ¶¶ 25–26.

V.M., who is sixteen now, was born while Louis was in Iraq, so she has never known her father in anything but his current state. *Id.* ¶ 9. As a result of living in this type of environment, she suffers from depression and avoids speaking to others. *Id.* ¶ 10. Her reclusive and withdrawn

nature fuel her depression, particularly because she cannot have friends over due to Louis'
temperament. *Id.* ¶¶ 8, 10. This greatly distresses Angelique. *Id.* ¶ 11.

Taking into consideration the Messina family members' close relationships with and deep
reliance on Louis, his abrupt and aggressive personality change, and the stark effect on Louis'
family, Plaintiffs suggest upward departures from the baseline framework. Plaintiffs request an
award of solatium damages of $5,000,000 for Angelique and $3,000,000 for V.M.

### ii.   Emotional Distress of Richard Hassler

Tamara and her father, Richard Hassler, had a good relationship prior to her injuries.
They talked weekly and would see each other a few times a year. Affidavit of Richard Hassler,
attached as "Exhibit 9," ¶ 4. After learning of the Attack, Richard became "very worried about
Tamara," but was "afraid to talk to her about what happened." *Id.* ¶ 8. It pained Richard to watch
Tamara cope with her injuries, and he "tried to help her in any way" he could. *Id.* ¶ 12.

Before the Attack, Tamara had been fully independent financially, physically, and
emotionally. *Id.* ¶ 5. However, after the Attack, she moved back in with her father. *Id.* ¶ 9.
Richard took her to most of her appointments, even after she moved out. *Id.* ¶ 10. Upon sitting in
on a few of her appointments, Richard noted that Tamara had noticeable changes in her
psychological functioning. *Id.* ¶ 13. Today, Tamara is still financially dependent on her father.
*Id.* ¶ 11. Richard does his best to support her, but Tamara's struggles with PTSD have made it
difficult for them to have an emotionally close relationship. *Id.* ¶ 8, 13. Plaintiffs request that
Richard Hassler be awarded a baseline solatium sum of $2,500,000.

### iii.   Emotional Distress of Barbara Curry

Barbara was diagnosed with dementia several years ago, resulting in compounded stress
on top of her husband's injuries. Ex. 6 ¶ 18–19. While Russell was deployed to Iraq, he would

routinely call home to check in on his wife and let her know he was well. *Id*. ¶ 21. But after learning of the bombing on television, Barbara became "an emotional wreck" because she was unable to reach her husband or his company to find out if he was dead or alive. *Id.* ¶ 22. She had no idea if Russell was "injured or dead," and because "the outlook appeared devastating . . . she assumed the worst." *Id*. Russell was able to call twice after the Attack, once a few hours after the bombing and once the next day, but he was heavily medicated and unable to provide a coherent update on his condition. *Id.* ¶¶ 23–24. Barbara finally heard from Russell several days later from Germany. *Id.* ¶ 25.

Once Russell arrived home, Barbara became sick when she saw his injuries and was distraught when he informed her that he wished to return to Iraq to complete his contract. *Id.* ¶¶ 26–27. Today, she often cannot remember the details of the Attack, such as where or when it happened, but each new discussion of the bombing causes her "great distress," as if she was learning of the incident for the first time. *Id*. ¶¶ 20, 22. Thus, even with her waning memory, Barbara still feels the emotional trauma she underwent as a result of the Attack. *Id.* ¶ 28.

Taking into consideration Barbara Curry's close relationships with Russell, her deep reliance on him, and the emotional impact on her, Plaintiffs request an award of $4,000,000.

### C.   Economic Losses

Economic damages are available to victims of terrorism in the form of lost wages and diminished earning capacity. In FSIA cases, "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed*, 845 F. Supp. 2d at 214. Vocational Specialist Barbara K. Beyers was retained to conduct a vocational evaluation and wage-earning capacity analysis for the Victim Plaintiffs.[7] She followed peer-reviewed

---

[7] No vocational or economic reports are provided for Russell Curry because Plaintiffs' experts could not support a claim for economic damages on his behalf.

methodology and standard vocational references in conducting her reports. *See* Expert Reports of Barbara K. Byers (hereinafter "Exhibit 10" regarding Louis Messina, "Exhibit 11" regarding Tamara Hassler, and "Exhibit 12" regarding Steven Thomas). Forensic economists Chad L. Staller and Stephen M. Dripps from The Center for Forensic Economic Studies were retained to determine the precise economic losses sustained. *See* Expert Reports from Center for Forensic Economic Studies (hereinafter "Exhibit 13" regarding Louis Messina, "Exhibit 14" regarding Tamara Hassler, and "Exhibit 15" regarding Steven Thomas).

### i.    Lost income for Louis Messina

Ms. Byers notes a letter from a psychiatrist concluding that Mr. Messina has not been able to work since 2007, had reached his maximum improvement in March 2009, and "is unable to return to any gainful employment" Ex. 10 at 2, 4. Accordingly, Ms. Byers concluded that Mr. Messina has lost all access to the labor market. *Id.* at 4.

Mr. Staller and Mr. Dripps then provided their expert opinions regarding the value of Mr. Messina's economic losses. Ex. 13 at 2. Two worklife estimates were offered: 23.2 additional years assuming Louis' statistical worklife expectancy, and 30.4 additional years assuming a continuous worklife to his Social Security retirement age. *Id*. at 2. Based on their review of Louis' employment records, Louis' average annual pay at the time of his injuries was $130,910. *Id*. at 3. Louis' anticipated lifetime income was increased to account for fringe benefits and future growth and decreased for taxes and present value. *Id*. at 3–5.

Based on that analysis, Mr. Staller and Mr. Dripps determined that the total economic loss for Louis Messina ranges between $3,387,769 to $4,660,982. *Id*. at 6. Plaintiffs suggest adoption of the 30.4-year worklife expectancy, leading to economic damages of $4,660,982.

### ii.    Lost income for Tamara Hassler

Ms. Byers determined that Ms. Hassler's psychological symptoms and medical restrictions have precluded her resumption of overseas security contracting jobs and restricted her ability to resume law enforcement work. Ex. 11 at 5. Based on these limitations, Ms. Byers concluded that Ms. Hassler "has no placeability in full time competitive work." *Id.*

Utilizing Ms. Byer's analysis, Mr. Staller and Mr. Dripps provided two worklife estimates: 28.0 additional years assuming Tamara's statistical worklife expectancy, and 31.0 additional years assuming a continuous worklife to her Social Security retirement age. Ex. 14 at 3. Based on Tamara's employment records, her average annual pay at the time of her injuries was $100,000. *Id.* Tamara's anticipated lifetime income was increased to account for fringe benefits and growth, but decreased to account for taxes and present value. *Id.* at 4–5.

Based on this analysis, Mr. Staller and Mr. Dripps determined that the total economic loss for Tamara Hassler ranges between $2,071,375 and $2,954,676. *Id.* at 6. Plaintiffs suggest adoption of the 31.0 year worklife expectancy and an economic damages award of $2,954,676.

### iii.    Lost income for Steven Thomas

Ms. Byers noted that Mr. Thomas has been "unable to continue his overseas work as an international police liaison officer since the 2005 bombing" and is limited to stateside work "not involving active police work in the field." Ex. 12 at 3–4. Mr. Staller and Mr. Dripps provided two worklife estimates: 22.0 additional years assuming Steven's statistical worklife expectancy, and 28.9 additional years assuming a continuous worklife to his Social Security retirement age. Ex. 15 at 2. Steven's average annual pay at the time of his injuries was $143,000. *Id.* at 3. Steven's anticipated lifetime income was increased to account for fringe benefits and future growth and then decreased for taxes and reduced to present value. *Id.* at 4–6.

Based on this analysis, Mr. Staller and Mr. Dripps determined that the total economic loss for Steven Thomas ranges between $1,812,895 and $2,776,249. *Id*. at 7. Plaintiffs suggest adoption of the 28.9 year worklife expectancy and an award of $2,776,249.

### D.   Punitive Damages

Under the FSIA, a foreign sovereign who is a state sponsor of terrorism may be held liable for punitive damages. 28 U.S.C. § 1605A(c); *Braun*, 228 F. Supp. 3d at 82. Punitive damages are awarded not to compensate the victims, but to "punish outrageous behavior and deter such outrageous conduct in the future." *Id*. at 87. The Court considers:

> (1) the nature of the act itself, and the extent to which any civilized society would find that act repugnant; (2) the circumstances of its planning; (3) Defendants' economic status with regard to the ability of Defendants to pay; and (4) the basis upon which a Court might determine the amount of an award reasonably sufficient to deter like conduct in the future, both by the Defendants and others.

*Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 33 (D.D.C. 1998). However, "application of these factors has not led to a single approach for calculating the amount of punitive damages." *Christie v. Islamic Republic of Iran*, Case No. 1:19cv1289, 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

The first method "multiplies a defendant's financial support for international terrorism . . . by a pre-determined multiplier" of usually either three or five. *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 17 (D.D.C. 2011). This is the process known as "the Flatow Method." *Id*. As the annual expenditures by state sponsors of terrorism continue to rise, courts have recognized that this method would lead to awards of punitive damages in the billions of dollars. *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021). As a result, some decisions from this Court have held that the Flatow Method should be reserved for "exceptionally deadly attacks." *See Braun*, 228 F. Supp. 3d at 87.

A second approach "awards a fixed amount of $150,000,000 per affected family." *Id.* (citing *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012); *Gates*, 580 F. Supp. 2d at 75. This approach is typically applied when the terrorist attacks are deadly or where "similar conduct has never been litigated." *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 117 (D.D.C. 2020).

A third approach multiplies the total compensatory damages awarded each victim "by a factor between one and five." *Fritz*, 324 F. Supp. 3d at 65. This multiplier is determined based on the severity and reprehensibility of the attack, *Selig*, 573 F. Supp. 3d at 75, and whether the case "involved exceptional circumstances, the perceived deterrence effect, the nexus between the defendant and the injurious acts, and the evidence plaintiffs presented regarding the defendant's funding for terrorist activities." *Frost*, 419 F. Supp. 3d at 117. This approach is often used where victims survive the terrorist attack, with a multiplier of three commonly awarded to survivors of bombings or shootings. *See, e.g.*, *Doe*, 2020 WL 5422844, at \*18; *see also Winternitz*, 2022 WL 971328, at \*1, 11; *Gill*, 249 F. Supp. 3d at 105–6 (D.D.C. 2017).

Here, the factors support an award of punitive damages. The Attack was a poignant example of reprehensible conduct calculated to inflict maximum damage on the United States, its contractors, and allies. With its vast provision of material support, Syria equipped AQI to carry out the Attack. Given the nature of the bombing, injuries of the victims, and findings in similar cases, Plaintiffs suggest that awarding punitive damages at a factor of three times compensatory damages is a suitable measure of punitive damages in this case.

## VIII.   CONCLUSION

WHEREFORE, Plaintiffs pray that this Court grant final judgment against Syria and award the following:

For the Messina family, a total sum of $72,643,928, allocated accordingly:

    a.  Compensatory damages for personal injuries to Louis Messina, including pain and suffering and economic damages in the amount of $12,160,982;

    b.  Solatium and Intentional Infliction of Emotional Distress damages comprised of the following sums:

        -  $5,000,000 on behalf of Angelique Messina, wife of Louis Messina;
        -  $3,000,000 on behalf of V.M., daughter of Louis Messina;

    c.  Punitive damages equal to three times the compensatory damages, as follows:
        -  $36,482,946 to Louis Messina;
        -  $15,000,000 to Angelique Messina;
        -  $9,000,000 to V.M.;

    d.  Interest on these awards, from March 9, 2005 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Hassler family, a total sum of $45,818,704, allocated accordingly:

    a.  Compensatory damages for personal injuries to Tamara Hassler, including pain and suffering and economic damages in the amount of $8,954,676;

    b.  Solatium damages in the amount of $2,500,000 to Richard Hassler;

    c.  Punitive damages equal to three times the compensatory damages, as follows:
        -  $26,864,028 to Tamara Hassler;
        -  $7,500,000 to Richard Hassler;

    d.  Interest on these awards, from March 9, 2005 until the date of judgment; and

    e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For the Curry family, a total sum of $36,000,000, allocated accordingly:

    a.  Compensatory damages for personal injuries to Russell Curry, including pain and suffering, in the amount of $5,000,000;

    b.  Solatium damages in the amount of $4,000,000 to Barbara Curry;

   c.  Punitive damages equal to three times the compensatory damages, as follows:
- $15,000,000 to Russell Curry
- $12,000,000 to Barbara Curry;

   d.  Interest on these awards, from March 9, 2005 until the date of judgment; and

   e.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Steven Thomas, a total sum of $31,104,996, allocated accordingly:

   a.  Compensatory damages for personal injuries to Steven Thomas, including pain and suffering and economic damages in the amount of $7,776,249;

   b.  Punitive damages equal to three times the compensatory damages, as follows:
- $23,328,747 to Steven Thomas;

   c.  Interest on these awards, from March 9, 2005 until the date of judgment; and

   d.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

Plaintiffs seek justice from this Court through a finding of liability and an award of damages against Syria for the provision of material support towards acts of extrajudicial killing and the resulting injuries suffered by Plaintiffs. Based on the totality of the evidence submitted, Plaintiffs request that the Court issue an Order GRANTING their Motion for Default Judgment.

Dated: September 7, 2022       Respectfully submitted,

      /s/ Kevin A. Hoffman
Randy D. Singer (DCD Bar No. VA057)
Kevin A. Hoffman (DC Bar No. 1044559)
SINGER DAVIS, LLC
1209A Laskin Road
Virginia Beach, VA 23451
Phone: (757) 301-9995
Fax: (757) 233-1084
Email: randy.singer@singerdavis.law
Email: kevin.hoffman@singerdavis.law
*Counsel for Plaintiffs*